**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**
Bankruptcy Judge Thomas B. McNamara

| | |
|---|---|
| In re:<br><br>ETG FIRE, LLC,<br><br>Debtor. | Lead Bankruptcy Case No. 24-13446 TBM<br>Chapter 11<br>(Subchapter V) |
| In re:<br><br>ETG FIRE MIDCO, LLC,<br><br>Debtor. | Bankruptcy Case No. 24-13447 TBM<br>Chapter 11<br>(Subchapter V) |
| MARMIC FIRE & SAFETY CO., INC.,<br>and APS FIRECO, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>ETG FIRE, LLC,<br><br>Defendant. | Adv. Pro. No. 24-1225 TBM |

**CORRECTED\* MEMORANDUM OPINION AND**
**ORDER DENYING MOTION TO DISMISS**

### I.       Introduction.

The Plaintiffs, Marmic Fire & Safety Co., Inc. ("Marmic") and APS FireCo, LLC ("APS") (together, the "Plaintiffs"), initiated this Adversary Proceeding against Debtor-Defendant, ETG Fire, LLC ("ETG Fire"), by filing a "Complaint to Determine Dischargeability of a Debt Pursuant to 11 U.S.C. § 523." (Docket No. 1, the

---

\*       This "Corrected Memorandum Opinion and Order Denying Motion to Dismiss" is substantively identical to the "Memorandum Opinion and Order Denying Motion to Dismiss" (Docket Nos. 10 and 11) entered March 17, 2025.  However, that document was based on a corrupted electronic file with numerous spelling and other errors.  This filing corrects such errors.

"Complaint.")[1]  As the title of the Complaint suggests, the Plaintiffs seek to establish the existence and amount of a debt allegedly owed to them by ETG Fire as well as the nondischargeability of such debt pursuant to 11 U.S.C. § 523(a)(6) of the Bankruptcy Code[2] as a debt for a "willful and malicious injury."  ETG Fire responded by filing "Defendant's Motion to Dismiss Adversary Proceeding" (Docket No. 4, the "Motion to Dismiss"), requesting dismissal of all causes of action under Fed. R. Civ. P. 12(b)(6), as incorporated by Fed. R. Bankr. P. 7012(b), for failure to state a claim upon which relief can be granted.  The Plaintiffs filed a "Response" to the Motion to Dismiss (Docket No. 5, the "Response") opposing dismissal.  Thereafter, ETG Fire filed a "Reply" in support of the Motion to Dismiss.  (Docket No. 7, the "Reply.")

Accepting all the facts alleged by the Plaintiffs in the Complaint as true, and having reviewed the Motion to Dismiss, Response, and Reply, the Court concludes that the Plaintiffs have alleged sufficient facts to properly state claims for relief under Fed. R. Civ. P. 12(b)(6), as incorporated by Fed. R. Bankr. P. 7012(b).  Therefore, the Motion to Dismiss must be denied.

## II.    **Jurisdiction and Venue.**

The Court has jurisdiction over this Adversary Proceeding and the Motion to Dismiss pursuant to 28 U.S.C. § 1334.  The dismissal contest is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) (matters concerning administration of the estate), (b)(2)(B) (allowance or disallowance of claims against the estate), (b)(2)(I) (determinations as to the dischargeability of particular debts), and (b)(2)(O) (other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor relationship).  Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Neither the Plaintiffs nor ETG Fire has contested venue in this Court or this Court's jurisdiction to adjudicate the Motion to Dismiss, Response, and Reply.

## III.    **Procedural Background.**

On June 20, 2024, ETG Fire filed for protection under Chapter 11, Subchapter V of the Bankruptcy Code, commencing the case captioned: *In re ETG Fire, LLC*, Bankr. Case No. 24-13446 TBM (Bankr. D. Colo.) (the "ETG Fire Case").  A related entity, ETG Fire Midco, LLC ("Midco"), filed for protection under Chapter 11, Subchapter V, on the same day, commencing the case captioned: *In re ETG Fire Midco, LLC*, 24-13447

---

[1]    The Court uses the convention "Docket No. ___" to refer to documents filed in this Adversary Proceeding: *Marmic Fire & Safety Co., Inc. et al. v. ETG Fire, LLC*, Adv. Pro. No. 24-1225 (Bankr. D. Colo.).  The Court uses the convention "ETG Docket No. __" to refer to documents filed in the main bankruptcy case captioned: *In re ETG Fire, LLC*, Bank. Case No. 24-13446 (Bankr. D. Colo.)  Finally, Court uses the convention "Midco Docket No. __" to refer to documents filed in the main bankruptcy case captioned: *In re ETG Fire Midco*, LLC, Bankr. Case No. 24-13447 (Bankr. D. Colo.).

[2]    11 U.S.C. § 101 *et seq.*  Unless otherwise indicated, all references to "Section" are to Sections of the Bankruptcy Code.

(Bankr. D. Colo.) (the "Midco Case").  (ETG Docket No. 1 and Midco Docket No. 1.)[3] Shortly thereafter, the Court ordered that the two main bankruptcy cases be jointly administered, with the ETG Fire Case serving as the lead case.  (ETG Docket Nos. 56 and 62 and Midco Docket Nos. 57 and 58.)

The Plaintiffs filed Proof of Claim No. 44-1 against ETG Fire, asserting a general unsecured claim in the amount of "not less than $5,447,788.36" (the "Plaintiffs' POC"). Subsequently, ETG Fire objected to the Plaintiffs' POC.  (ETG Docket No. 229, the "POC Objection").  ETG Fire's POC Objection remains pending.

The ETG Fire Case and Midco Case have generated substantial disputes (including many between the Plaintiffs and ETG Fire and Midco).  ETG Fire and Midco proposed a series of "Joint Subchapter V Plan[s] of Reorganization."  (ETG Docket Nos. 197, 244, and 295.)  The most recent "Joint Subchapter V Plan of Reorganization" is dated November 25, 2024 (the "Operative Plan").  (ETG Docket No. 295.)  The Plaintiffs and several other creditors objected to the Operative Plan.  (ETG Docket Nos. 332, 342 and 346.)  According to the "Ballot Report" submitted by ETG Fire and Midco, "Class 4 [of the Operative Plan] is not presently an accepting class."  (ETG Docket No. 351 at 3.) Thus, at least at this stage, ETG Fire and Midco appear to be prosecuting the Operative Plan on a nonconsensual basis under Section 1191(b).  (ETG Docket Nos. 352 at 26 (arguing that "the [Operative] Plan complies with Section 1191(b)"); ETG Docket No. 353 at 2 ("the Debtors request that the Court confirm the Plan pursuant to 11 U.S.C. § 1191(b)").  The Operative Plan has not been confirmed.

Meanwhile, on September 30, 2024, the Plaintiffs filed the Complaint.  In the Complaint, the Plaintiffs assert eleven counts against ETG Fire:  (1) misappropriation of confidential information; (2) misappropriation of trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1831-1839; (3) misappropriation of trade secrets in violation of the Missouri Uniform Trade Secrets Act, Mo. Rev. Stat. § 417.450 - 417.467; (4) tortious interference with contract; (5) tortious interference with business expectancy; (6) aiding and abetting breach of fiduciary duty and duty of loyalty; (7) tortious interference with contractual and legal obligations; (8) violation of the Missouri Computer Tampering Act, Mo. Rev. Stat. § 537.525; (9) unfair competition; (10) unjust enrichment; and (11) "objection to discharge"[4] under Section 523(a)(6).  In sum, through the Complaint, the Plaintiffs are attempting to prove the amount of the debt they assert is owed to them by the ETG Fire, as well as the nondischargeability of such debt.

---

[3]      The Court takes judicial notice of the dockets in the ETG Fire Case, the Midco Case, and the Adversary Proceeding for purposes of describing the current procedural status.  *See St. Louis Baptist Temple, Inc. v. F.D.I.C.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (a court may *sua sponte* take judicial notice of its docket)..

[4]      Although the Plaintiffs titled their eleventh count as "objection to discharge" (which typically suggests a claim under Section 727) the title, text and content of their eleventh count refers to Section 523(a)(6).  Section 523(a)(6) is directed toward a determination of the nondischargeability of a particular debt, not a general objection to discharge.

ETG Fire did not answer the Complaint.  Instead, ETG Fire filed the Motion to Dismiss, seeking dismissal of all claims in the Complaint pursuant to Fed. R. Civ. P. 12(b)(6), as incorporated by Fed. R. Bankr. P. 7012(b), on the ground that the Plaintiffs failed to state a claim upon which relief may be granted.  The Plaintiffs presented the Response and ETG Fire filed the Reply.  The dispute framed by the Motion to Dismiss, Response, and Reply is fully briefed and ready for decision.

## IV.   Standard for Evaluating Motions to Dismiss Under Fed. R. Civ. P. 12(b)(6).

The Court's analysis of the Motion to Dismiss, Response, and Reply starts with the applicable federal rules of procedure.  In this case, ETG Fire asserts that the Complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6), which is applicable per Fed. R. Bankr. P. 7012(b).  Fed. R. Civ. P. 12(b)(6) provides:

> Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required.  But a party may assert the following defenses by motion . . . failure to state a claim upon which relief can be granted . . . .

When considering a motion to dismiss under Fed R. Civ. P. 12(b)(6) (as incorporated by Fed. R. Bankr. P. 7012(b)), the Court accepts as true all well-pleaded factual allegations in the complaint and views them in the light most favorable to the Plaintiffs.  *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013).  Under the refined pleading standard articulated by the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), a complaint will be dismissed unless it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  *See also Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (referring to clarified standard under *Twombly* and *Iqbal* as a "refined standard").

Under the "refined standard," a claim is considered "plausible" when the complaint contains facts which allow the Court "to draw a reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  "Plausible" does not mean "probable," although the plaintiff must show that its entitlement to relief is more than speculative.  *Id.*; *Twombly*, 550 U.S. at 555.  If the allegations in a complaint "are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs have not nudged their claims across the line from conceivable to plausible."  *Kansas Penn*, 656 F.3d at 1215.  Put another way, "the complaint must give the Court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims."  *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis in original).

"The nature and specificity of the allegations required to state a plausible claim will vary based on context."  *Kansas Penn*, 656 F.3d at 1215; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience

4

and common sense.").  Thus, the Tenth Circuit has held that "the *Twombly/Iqbal* standard is 'a middle ground between heightened fact pleading, which is expressly rejected, and allowing complaints that are no more than labels and conclusions or a formulaic recitation of the elements of a cause of action, which the Court stated will not do.'" *Khalik v. United Airlines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (citing *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008)) (internal quotation marks and citations omitted in *Khalik*).

The Court is bound to accept only factual allegations as true and will not give deference to legal conclusions.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 578.  As a result, courts often begin their analysis by identifying allegations that are no more than conclusions and, therefore, not entitled to the "assumption of truth."  *Id.* at 679.  Legal conclusions must be supported by well-pleaded factual allegations, which can be assumed as true and evaluated as to whether they plausibly give rise to the requested relief.  *Id.*  This process is a context-specific task which depends on the elements of a particular claim and requires the Court to draw upon its judicial experience and common sense.  *Burnett*, 706 F.3d at 1236 (quoting *Iqbal*, 556 U.S. at 679).  Careful evaluation is necessary both to ensure that a defendant is sufficiently able to prepare his defense and to avoid "ginning up the costly machinery associated with our civil discovery regime on the basis of a largely groundless claim."  *Kansas Penn*, 656 F.3d at 1215 (internal quotation omitted).

Ultimately, the critical question is: "assum[ing] the truth of all well-pleaded facts . . . and draw[ing] all reasonable inferences therefrom in the light most favorable to the plaintiffs," whether the compliant "raise[s] a right to relief above the speculative level.'" *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (quoting *Twombly*, 550 U.S. at 555).  It is a low threshold.  "[G]ranting [a] motion to dismiss is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice."  *Dias*, 567 F.3d at 1178 (quoting *Duran v. Carris*, 238 F.3d 1268, 1270 (10th Cir. 2001)).  Thus, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, (1974)).

## V.   Summary of Factual Allegations in Complaint.

The factual allegations of the Complaint (which must be accepted as true) may be summarized as follows:

## A.   Allegations Regarding Plaintiffs, Operations, and Confidential Information.

Marmic is a Missouri corporation with operations throughout the United States. (Compl. ¶ 9.)  APS is a limited liability company organized under the laws of the State of Oklahoma with operations throughout the United States. (Compl. ¶ 10.)  Marmic acquired APS on or about October 23, 2021, and APS remains a wholly-owned subsidiary of Marmic.  (Compl. ¶ 11.)  Marmic operates a full-service fire protection

5

business, providing retail, medical, commercial, and industrial companies with hazard analysis, fire and personal safety products, fire suppression installations, and inspection services conforming to mandates from the Occupational Safety and Health Administration, government codes, and National Fire Protection Association standards. (Compl. ¶ 18.)  APS provides inspection, design, and project services in the fire-protection industry as well as products and services relating to fire protection, including without limitation fire alarms, fire sprinklers, fire extinguishers, kitchen hood fire systems, and special hazard fire systems.  (Compl. ¶ 19.)

The Plaintiffs' relationships, technical know-how, and customer goodwill are the result of the Plaintiffs' substantial investment and effort over extensive periods of time, and constitute business assets of significant and substantial value.  (Compl. ¶ 21.)  The Plaintiffs entrust their goodwill and their customers' preferences to a team of sales professionals who manage their relationships with key accounts and serve as Plaintiffs' face during their employment.  (Compl. ¶¶ 20-21.)   The Plaintiffs' sales representatives and management employees have access to confidential, proprietary, and valuable information about Plaintiffs' business, including bidding information; customer preferences and anticipated projects; CAD graphics; floor plans; business plans; market research and forecasts; marketing and advertising plans, techniques, and budgets; pricing strategies; cost sheets; supplier information; and product specifications, designs, inventions and techniques.  (Compl. ¶ 22.)  The Plaintiffs compensate their employees in exchange for their service to the Plaintiffs.  (Compl. ¶ 20.)

To protect their confidential information from disclosure to third parties, including competitors, the Plaintiffs enacted company-wide policies, including a Confidential Company Information Policy.  Under that policy, confidential information about the Plaintiffs' business, "including but not limited to information regarding Company finances, pricing, products and new product development, software and computer programs, marketing strategies, suppliers and customers and potential customers" must be kept confidential.  Further, such confidential information must not be disclosed to the Plaintiffs' competitors.  In addition, under the Confidential Company Information Policy, "any employee who improperly copies, removes (whether physically or electronically), uses or discloses confidential information to anyone outside of the Company may be subject to disciplinary action up to and including termination."  (Compl. ¶ 24.)  In addition, the Plaintiffs' Employee Code of Conduct requires employees to "comply with any federal, state or local laws" and to "show integrity and professionalism in the workplace," and provides that employees are expected to prevent potential conflicts of interest by "avoid[ing] any personal, financial or other interests that might impact their capability or willingness to perform their job duties, or alter their decisions."  (Compl. ¶ 25.)  The Plaintiffs' Employee Code of Conduct notifies employees that Plaintiffs "may take legal action in cases of corruption, theft, embezzlement or other unlawful behavior." (Compl. ¶ 26.)  The Plaintiffs further protect their confidential information by maintaining all confidential information on Plaintiffs' secure and password-protected network and by requiring each employee to use unique login credentials to access information stored on Plaintiffs' computer network and systems.  For sales-focused employees, the Plaintiffs maintain cloud-based databases of customer and sales information that can be

accessed only by a limited set of employees who have a business need to access such information.  (Compl. ¶ 27.)

**B.      Allegations Regarding ETG Fire.**

ETG Fire is a direct competitor of the Plaintiffs.  (Compl. ¶ 3.)  ETG Fire was established in 2013 by its Founder and former President, Chris Vanderstokker ("Vanderstokker"). (Compl. ¶¶ 2-3.)  Vanderstokker sold ETG Fire to Erdoni, LLC ("Erdoni"), pursuant to a Unit Purchase and Sale Agreement dated January 19, 2022 (the "PSA").  (Compl. ¶ 4.)  Following Erdoni's purchase of ETG, Christopher Czarnowski  ("Czarnowski") became the Chief Executive Officer of ETG Fire, and Vanderstokker remained employed by ETG Fire in a sales and consulting role.  (Compl. ¶ 5.)

**C.      Allegations Regarding Certain of Plaintiffs' Employees and Their Employment Contracts.**

APS hired Tyler Aebersold ("Aebersold") in October 2013.  Following Marmic's acquisition of APS in 2021, Aebersold worked on behalf of both the Plaintiffs.  When he was hired by APS in 2013, Aebersold signed an employment agreement that contained certain restrictive covenants.  (Compl. ¶ 34.)  On or about November 17, 2021, Aebersold signed a Confidentiality Agreement and Agreement Not to Compete with Marmic (the "Aebersold Agreement"). (Compl. ¶ 30.)  The Aebersold Agreement provided:

> Whereas, it is agreed that the Employee, during the period of employment with Employer and for a period of 36 months following the termination of Employee's employment with the Employer will not either directly or indirectly call upon, solicit, divert or take away or attempt to solicit, divert or take away any of the customers, business or patrons of the Employer upon whom the Employee called or solicited or catered or became acquainted with while employed with the Employer. It is furthermore agreed that during the term of Employee's employment and for a period of 36 months after the termination of employment, the Employee will not participate directly or indirectly, personally or as the agent or Employee of another, in the ownership, management, operation or control of any business similar to the type of business conducted by the Employer at the time of the termination of this Agreement within a 100-mile radius of any location owned by Joplin Fire Protection Co., Inc. or Marmic Fire & Safety, Inc.

(Compl. ¶ 31.)  The Aebersold Agreement further provided:

> Employee further agrees that the information gained by
> Employee in promoting Employer's business including, by
> way of illustration and without limitations, the names and
> addresses of the customers of the Employer and the
> marketing methods are confidential information and
> Employee shall not disclose to any parties such information
> during the period of his employment or for a period of 36
> months thereafter.

(Compl. ¶ 32.)  Finally, the Aebersold Agreement stated:

> Employee also agrees, during Employee's engagement with
> Employer and for a period of one (1) year after my
> employment ends for any reason, not to directly or indirectly,
> solicit, recruit, hire or otherwise interfere with the
> employment of Employer's employees.

Aebersold voluntarily resigned from his employment relationship with the
Plaintiffs, effective on May 9, 2023.  (Compl. ¶¶ 28, 95.)  At the time of his resignation
from employment with the Plaintiffs, Aebersold held the role of Sales Manager.  (Compl.
¶ 28.)  As Sales Manager, Aebersold was responsible for working directly with and
developing and maintaining goodwill with Plaintiffs' customers, including customers
focused on special fire hazard protection systems, which are fire protection systems
designed to protect a highly sensitive or valuable asset or to provide fire protection in
areas where fire-sprinkler use is not a viable option.  (Compl. ¶ 29.)

APS hired Gary Holmes in January 2015.  On or about February 25, 2016,
Holmes signed an "Employee Confidential Information, Non-Solicitation and
Noncompete Agreement" (the "Holmes Agreement") with APS.  Holmes worked for APS
in the Tulsa County, Oklahoma area at the time he signed the Holmes Agreement and
through the date of his voluntary resignation from employment on August 23, 2022.
(Compl. ¶¶ 37 and 57.)

Paragraph 3 of Holmes Agreement states, among other things, that Holmes
"understands and agrees that the confidential business and customer information of
[the] Company is a valuable business asset belonging to the Company and [Holmes]
will not, during the term of this Agreement or any time hereafter, directly or indirectly,
copy, disseminate, or make use of such information for any purpose unrelated to
Company's business, and will keep the same in the strictest of confidence."  Paragraph
3 further outlines examples of "confidential information," and states that Holmes may "at
no time, in any fashion, form, or manner directly or indirectly use, divulge or disclose
such information to any third party without first obtaining the express written consent of
the Company."  Paragraph 3 of Holmes Agreement requires Holmes to "immediately
return to Company any and all of Company's records, sales, materials, samples, forms,
documents, vendor materials, sales records and all other property and documents of

8

any nature whatsoever." (Compl. ¶ 38.) The Holmes Agreement also states that "upon [Holmes'] separation from employment," Holmes may not

> for any reason . . . directly or indirectly, personally or through any other person or business, seek to cause any other employees or independent representatives of Company to terminate their relationships with Company and will not, directly or indirectly, assist any other person or entity in seeking to do so.

(Compl. ¶ 39.) Finally, Paragraph 5 of Holmes Agreement prohibits Holmes from "[d]irectly solicit[ing] the Established Customers of the Company or of Company's related entities." (Compl. ¶ 40.)

At the time of his separation from the Plaintiffs on August 23, 2022, Holmes held the role of Director, Special Hazard & Alarm Systems. (Compl. ¶ 35.) As Director, Special Hazard & Alarm Systems, Holmes had access to the Plaintiffs' confidential information and trade secrets. Furthermore, he led and oversaw the Plaintiffs' special fire hazard protection business. He held a significant leadership role that required him to exercise business judgment on behalf of the Plaintiffs with respect to the special fire hazard protection business and that placed him in a position to develop close relationships with, and influence over, the Plaintiffs' employees and customers. (Compl. ¶ 36.)

APS hired Lynn Mullin in August 1998. (Compl. ¶ 41.) On or about December 8, 2016, Mullin signed an "Employee Confidential Information, Non-Solicitation and Noncompete Agreement" (the "Mullin Agreement") with APS. (Compl. ¶ 43.) The terms of the Mullin Agreement are virtually identical to the Holmes Agreement. (Compl. ¶¶ 44-46.) In March 2023, Mullin submitted her voluntary resignation to Plaintiffs. Mullin's resignation took effect in April 2023. (Compl. ¶ 92.) At the time of her separation, Mullin held the role of Project Sales Manager, focusing on the Plaintiffs' special fire hazard protection business. (Compl. ¶ 41.) In her role as Project Sales Manager, Mullin had access to the Plaintiffs' confidential information and trade secrets. Furthermore, Mullin's work for the Plaintiffs in its special fire hazard protection business division provided her with significant access to the Plaintiffs' customer relationships and confidential information about those customers. This access provided Mullin with an opportunity to develop close relationships with, and influence over, the Plaintiffs' customers. (Compl. ¶ 42.)

APS hired Catesa Smith ("Smith") in November of 2005. (Compl. ¶ 47.) On or about December 10, 2014, Smith signed an "Oklahoma Employee Confidential Information, Non-Solicitation, and Non-Compete Agreement" ("the Smith Agreement"). (Compl. ¶ 49.) The terms of the Smith Agreement are similar to the Holmes Agreement. (Compl. ¶ 50-52.) Smith worked for the Plaintiffs in the Tulsa County, Oklahoma area at the time she signed the Smith Agreement and through the date of her voluntary resignation from employment in August 2023. (Compl. ¶ 49.)

**D.      Allegations Regarding Conspiracies Between ETG Fire, Aebersold, Holmes, and Mullin While Aebersold, Holmes, and Mullin Were Employed by Plaintiffs.**

Between August 2022 and August 2023, ETG Fire raided a large group of employees working for Plaintiffs, including in Plaintiffs' special fire hazard protection business division.  (Compl. ¶ 53.)  In addition to raiding Plaintiffs' employee base, ETG Fire engaged in efforts to obtain and use Plaintiffs' confidential information and trade secrets so that ETG Fire could divert customer projects and relationships from Plaintiffs to ETG Fire. (Compl. ¶ 54.)

At the time of ETG Fire's sale to Erdoni during January 2022, Marmic employed Aebersold, Holmes, Mullin, Smith, Joshua Westphal ("Westphal"), Joseph Smothermon ("Smothermon"), and other employees, in or near Tulsa, Oklahoma.  In the course of their employment for Plaintiffs, Aebersold and Mullin prepared bids for the Plaintiffs to submit to customers, using Plaintiffs' proprietary cost sheets and other trade secrets and confidential information, including Plaintiffs' relationship with the customer and the customer's preferences, pricing strategies, supplier and vendor information and costs, and product specifications, designs, and techniques.  (Compl. ¶ 64.)  The bids constitute confidential and competitively valuable information that rises to the level of trade secret.  (Compl. ¶ 64.)

Prior to the conclusion of Holmes' employment with the Plaintiffs in August 2022, he began performing services for ETG Fire, including carrying out efforts to divert Plaintiffs' customers to ETG Fire.  (Compl. ¶ 57.)  Holmes also emailed Plaintiffs' documents, including a third-party consulting report titled "Handbook," from his APS FireCo email to his personal email. (Compl. ¶ 79.)  Holmes began officially working for ETG Fire as its Chief Operations Officer shortly after his separation from the Plaintiffs. (Compl. ¶¶ 57, 79.)

Prior to the date on which Holmes voluntarily ended his employment with Plaintiffs, Vanderstokker, Troy Kinder (ETG Fire's Chief Information Officer) ("Kinder"), Holmes, Aebersold, Mullin, and employees of ETG Fire worked together to pursue the diversion of business from Plaintiffs to ETG Fire, including by preparing bids for customer projects on behalf of ETG Fire that had solicited bids from Plaintiffs — not from ETG Fire.  Pursuant to this scheme, Mullin and Aebersold would prepare bids for Plaintiffs' customers on Plaintiffs' letterhead and send them to Vanderstokker and Kinder to be signed and submitted to customers on behalf of ETG Fire.  (Compl. ¶¶ 58 and 62)  Aebersold regularly communicated with Holmes and Vanderstokker, and Aebersold discussed ETG Fire's projects with the ETG Fire's customers, answered customer questions, and prepared revised bids.  (Compl. ¶ 63.)

While Holmes, Aebersold, and Mullin remained employed with Plaintiffs, they engaged in a process they called "ETG-izing" the bids (meaning, to put the Plaintiffs' customer bids on ETG Fire letterhead).  Vanderstokker and Kinder would share the

"ETG-ized" bids with Plaintiffs' customers in an effort to divert the projects to ETG Fire, and they and multiple other officers of ETG Fire knowingly encouraged, aided, and abetted Holmes', Aebersold's, and Mullin's diversion of Plaintiffs' customers to ETG Fire as well as their use of Plaintiffs' proprietary and confidential information and trade secrets.  (Compl. ¶¶ 59, 60, 61, 64, 65, 67, 68-77.)

Aebersold, Mullin, Holmes, Vanderstokker, Kinder, and other employees of ETG Fire knew that ETG Fire was not authorized by Plaintiffs to receive bids that were prepared by Plaintiffs' employees for Plaintiffs' customers, and furthermore knew that they were not authorized to use those bids in order to prepare a lower-priced bid on behalf of ETG Fire.  (Compl. ¶ 66.)  Holmes, Mullin, and Aebersold took the foregoing actions with the goal of diverting clients and business opportunities from the Plaintiffs to ETG Fire prior to their separation from Plaintiffs, so that Holmes, Mullin, and Aebersold (along with other of Plaintiffs' employees that thereafter worked for ETG Fire) would have an established pipeline of commission-generating business upon their arrival at ETG Fire.  (Compl ¶ 56.)  ETG Fire's actions were undertaken with the encouragement, assistance, and direction of Czarnowski, Vanderstokker, Kinder, and other high-ranking officers and employees of ETG Fire.  At the highest level of the company, ETG Fire was fully aware and supportive of the scheme spearheaded by Czarnowski, Vanderstokker, and other ETG Fire employees.  (Compl. ¶ 55.)  ETG Fire subsequently won certain customer bids that it was competing with the Plaintiffs to win. (Compl. ¶ 61.)

E.    **Allegations Regarding Continuation of the Conspiracies Between ETG Fire, Aebersold, Holmes, and Mullin After They Resigned from Their Positions With Plaintiffs.**

After Holmes resigned from his position with the Plaintiffs in August 2022, he began working for ETG Fire.  (Compl. ¶ 78.)  Thereafter, ETG Fire and Holmes continued to conspire and work with Mullin and Aebersold, who were both still employees of Plaintiffs, to divert customers and business opportunities from Plaintiffs to ETG Fire and to misappropriate trade secrets including proprietary design drawings; project files for Plaintiffs' customer projects and bids, including CAD graphics, floor plans, cost sheets, purchase orders, warranty letters, billing requests, job proposals, and project checklists owned by Plaintiffs; quotes Mullin had provided to Plaintiffs' customers, detailed information about Plaintiffs' projects, safety data sheets, plant layouts, and correspondence with Plaintiffs' customers.  (Compl. ¶¶ 80, 81, 83, 112-137.)

After Holmes began working for ETG Fire, he solicited Plaintiffs' employees, including Aebersold, Mullin, and Westphal, to work for ETG Fire.  (Compl. ¶¶ 83-87.)  Holmes did so with Czarnowski's assistance and blessing.  Indeed, Czarnowski sent Aebersold and Mullin each a laptop in February 2023, while they were still employed with Plaintiffs, to facilitate their misappropriation and misuse of Plaintiff's confidential and proprietary information and trade secrets.  (Compl. ¶¶ 88-94.)

ETG Fire paid both Aebersold and Mullin commissions for bids they prepared for ETG Fire and helped win for ETG Fire while they was still employed by Plaintiffs. (Compl. ¶¶ 96-97.)  Holmes was aware that these activities violated his contractual obligations, along with those Aebersold and Mullin owed to the Plaintiffs.  (Compl. ¶ 82.) And ETG Fire knew that its conduct breached Aebersold's, Mullin's, Holmes', and Smith's duties and contractual obligations owed to Plaintiffs. (Compl. ¶ 139.)  ETG Fire injured the Plaintiffs by willfully and maliciously undertaking their scheme to misappropriate Plaintiffs' confidential and trade secret information, and to use that information to wrongfully solicit Plaintiffs' customers to do business with ETG Fire to the detriment of Plaintiffs.  (Compl. ¶ 212.)  ETG Fire's actions, through its agents, were deliberate, intentional, and premediated, and ETG Fire intended to inflict harm on the Plaintiffs' business.  (Compl. ¶¶ 213 and 214.)

**F.**  **Allegations Regarding Conspiracy Between ETG Fire and Smith.**

While employed with Plaintiffs, Smith was privy to confidential information and/or trade secrets, including national account pricing, related to Plaintiffs' bid in a request for proposal ("RFP") for an established customer.  (Compl. ¶ 99.)  In December 2022, Smith forwarded the documents related to the RFP from her APS email to her personal email.  She also emailed Holmes with an Excel spreadsheet identifying prospective customers for ETG Fire.  Over 50 of the entries on the spreadsheet are active customers of Plaintiffs and Established Customers under the Smith Agreement. Holmes responded to the email, attaching a revised spreadsheet and information regarding salary, sales projections, and revenue estimates if she joined ETG Fire. (Compl. ¶¶ 100-102.)

Smith remained employed with the Plaintiffs until she resigned from her position on August 22, 2023. (Compl. ¶ 104.)  She then became employed by ETG Fire, where she worked to solicit at least three of the Plaintiffs' established customers, including the customer to whom the Plaintiffs submitted a bid in connection with the RFP.  In late 2023, Smith and Czarnowski communicated regarding efforts to solicit the business of the Plaintiffs' established customers.  ETG Fire continues to utilize confidential information and/or trade secrets taken by Smith to solicit and perform business. (Compl. ¶¶ 103-111.)

**VI.**   **The Motion to Dismiss and Response.**

**A.**  **ETG Fire's Arguments in Favor of Dismissal of the Complaint.**

Like a three leaf Shamrock, ETG Fire seeks dismissal of all claims in the Complaint on three related but independent grounds.  First, ETG Fire contends that Section 523(a) "only exempts from discharge debts against individual debtors and not corporate debtors" in Subchapter V.  (Mot. at 5.)  Second, ETG Fire argues that even if Section 523(a) applies to exempt from discharge debts of corporate debtors, the Plaintiffs fail to state a claim under Section 523(a)(6) because Section 523(a)(6) requires a showing that ETG Fire acted with a culpable state of mind, and the allegations in the Complaint show, at most, that individuals other than ETG Fire acted

with the requisite state of mind.  Third, ETG Fire contends that the claims are improperly brought in the Complaint and must be dealt with in the claims objection process (*i.e.,* the Plaintiffs' POC and ETG Fire's POC Objection) rather than in an adversary proceeding.

**B.**     **The Plaintiffs' Arguments Against Dismissal of the Complaint.**

The Plaintiffs disagree with ETG Fire's reading of statutes which govern the applicability of Section 523(a) to the debts of corporate debtors in Subchapter V, and contend that Section 523(a) does apply to except from discharge certain debts of corporate debtors in Subchapter V cases.  The Plaintiffs also disagree with the ETG Fire's contention that the Plaintiffs fail in the Complaint to state a claim for relief that is plausible on its face.  The Plaintiffs assert that the Complaint adequately alleges ETG Fire's improper intent under Section 523(a)(6).  Further, the Plaintiffs take issue with the notion that, by filing the Complaint, they are attempting to circumvent the claims process, noting that the issue of nondischargeability is one which must be addressed through an adversary proceeding.

## VII.     Legal Analysis.

**A.**     **General Framework for Evaluation of Section 523(a) Claims.**

In the Complaint, the Plaintiffs assert that ETG Fire is indebted to them as a result of its alleged wrongful conduct.  The Plaintiffs further contend that the debt arising from ETG Fire's misconduct is nondischargeable under 11 U.S.C. § 523(a)(6).  The Plaintiffs bear the burden of establishing nondischargeability of a particular debt under Section 523(a) by a preponderance of the evidence.  *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991) ("requiring the creditor to establish by a preponderance of the evidence that his claim is not dischargeable reflects a fair balance between these conflicting interests."); *Houston v. Munoz (In re Munoz)*, 536 B.R. 879, 884 (Bankr. D. Colo. 2015) (requiring creditor to prove Section 523(a) claims by a preponderance of the evidence).  Additionally, exceptions to discharge under Section 523(a) "are to be narrowly construed, and because of the fresh start objectives of bankruptcy, doubt is to be resolved in the debtor's favor."  *Bellco 1st Fed. Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir. 1997).  *See also Sawaged v. Sawaged (In re Sawaged)*, 2011 WL 880464, at *3 (Bankr. D. Colo. Mar. 15, 2011) (same).

The term "debt" is defined in Section 101(12) as "liability on a claim."  And, under Section 101(5), a "claim" means a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured . . . ."  11 U.S.C. § 101(5)(A).

Section 523(a) nondischargeability claims all require a two-part analysis.  First, "the bankruptcy court must determine the validity of the debt under applicable law."  *Hatfield v. Thompson (In re Thompson)*, 555 B.R. 1, 8 (10th Cir. BAP 2016).  *See also Lang v. Lang (In re Lang)*, 293 B.R. 501, 513 (10th Cir. BAP 2003).  This is referred to as the "claim on the debt" component.  *Thompson*, 555 B.R. at 8.  The claim on the debt

component is decided based upon applicable non-bankruptcy law.  *See Grogan*, 498 U.S. at 283 ("The validity of a creditor's claim is determined by rules of state law."); *New Mexico Department of Workforce Solutions v. Beebe (In re Beebe)*, 2016 WL 4945454, at *6 (Bankr. D.N.M. Sept. 14, 2016) ("Whether a debt exists is determined by looking to applicable law, frequently state law.  To establish the claim on the debt under § 523(a)(2)(A), the claimant must establish that the debtor is liable on an enforceable obligation under applicable non-bankruptcy law, nothing more nor less.")  Second, if there is a valid debt, "the bankruptcy court must determine the dischargeability of that debt under Section 523."  *Id*.  *See also Lang*, 293 B.R. at 513 ("bankruptcy law controls with respect to the determination of nondischargeability").  This is referred to as the "dischargeability" component.  *Thompson*, 555 B.R. at 8.

So, generally, the Court's first step in determining whether a plaintiff has stated a claim under Section 523(a)(6) is evaluating whether the facts pled in support of each claim for relief suffice to state a claim, based upon applicable non-bankruptcy law, for which the defendant may be liable, or indebted to the plaintiff.  The next step requires the Court to determine whether the plaintiff has pled facts that could support a determination that any such debt is nondischargeable, based on bankruptcy law.

In this case, ETG Fire does not contest that the Complaint stated sufficient facts to satisfy the "claim on the debt'" component; instead, its argument for dismissal relates *solely* to the second component: dischargeability.  That is, ETG Fire contends that under the Bankruptcy Code, the debts of corporate debtors, including those in Subchapter V, cannot be deemed nondischargeable under Section 523(a).[5]  ETG Fire further contends that the Plaintiffs cannot state a claim under Section 523(a)(6) because the acts of which the Plaintiffs complain are the acts of third parties (ETG Fire's management and employees), which cannot be imputed to ETG Fire.  As such, ETG Fire asserts that it cannot be found to have acted with the requisite intent necessary to find any alleged debt nondischargeable.  Finally, ETG Fire argues that Plaintiffs are limited to the claims allowance and disallowance process and cannot pursue an adversary proceeding to establish debt.

Given ETG Fire's discrete dischargeability arguments in the Motion to Dismiss, the Court assumes (without finally deciding) that ETG Fire has alleged sufficient facts to state a claim for relief with respect to the debt component.  Thus, the Court will confine its analysis only to the issues raised by ETG Fire on the dischargeability component.

## B.   Section 523(a) Is Applicable to Debts of Corporate Debtors in Subchapter V Cases.

About six years ago, Congress made a significant addition to Chapter 11 of the Bankruptcy Code:  the Small Business Reorganization Act of 2019 (the "SBRA").[6]  The SBRA (commonly referred to as "Subchapter V"), was designed to streamline the

---

[5]      The Court recognizes that ETG Fire disputed the amount and validity of the Plaintiffs' POC through the POC Objection.  That issue is preserved.  However, ETG Fire has not attacked the amount and validity of ETG Fire's alleged debt to the Plaintiffs in the Motion to Dismiss.

[6]      Pub L. No. 116-54, 133 Stat. 1079 (mainly codified at 11 U.S.C. §§ 1181-1195).

reorganization and rehabilitation process for small business debtors.  Substantively, the SBRA lowered the Chapter 11 bar for confirmation of a plan of reorganization by permitting confirmation even if all classes of creditors reject the proposed plan and by eliminating the so-called "absolute priority rule."  Procedurally, Congress simplified some of the more cumbersome aspects of standard Chapter 11 cases by eliminating unsecured creditors' committees and disclosure statements.  Suffice it to say that the SBRA offers many potential advantages for qualifying Chapter 11 debtors.

ETG Fire elected to proceed under Subchapter V to secure such advantages.  But, since the SBRA is still fairly new, there are some uncertainties.  Both the Plaintiffs and ETG Fire recognize that there exists a split of legal authority regarding whether the Section 523(a) nondischargeability provisions (such as Section 523(a)(6)) apply to corporate debtors, including limited liability companies,[7] in Subchapter V cases where the proposed reorganization is nonconsensual.

"If a debtor's bankruptcy plan is confirmed as a consensual plan under § 1191(a), the dischargeability of its debts is governed by § 1141(d)."  *Avion Funding, L.L.C. v. GFS Indus., L.L.C. (In the Matter of GFS Indus., L.L.C.)*, 99 F.4th 223, 227 (5th Cir. 2024).[8]  The upshot is that a corporate entity successfully achieving confirmation of a consensual reorganization plan under Section 1191(a) may discharge almost all its debts irrespective of the Section 523(a) nondischargeability provisions.[9]

---

[7]      Limited liability companies are included within the definition of "corporation" in the Bankruptcy Code.  11 U.S.C. § 101(9)(a).

[8]      Section 114(d)(1) states:

> Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan —
>> (A) discharges the debtor from any debt that arose before the date of such confirmation, and any debt of a kind specified in section 502(g), 502(h), or 502(i) of this title, whether or not —
>>> (i) a proof of the claim based on such debt is filed or deemed filed under section 501 of this title;
>>> (ii) such claim is allowed under section 502 of this title; or
>>> (iii) the holder of such claim has accepted the plan; and
>> (B) terminates all rights and interests of equity security holders and general partners provided for by the plan.

[9]      There is a narrow exception.  Section 1141(d)(6) states:

> Notwithstanding paragraph (1), the confirmation of a plan does not discharge a debtor that is a corporation from any debt —
>> (A) of a kind specified in paragraph (2)(A) or (2)(B) of section 523(a) that is owed to a domestic governmental unit, or owed to a person as the result of an action filed under subchapter III of chapter 37 of title 31 or any similar State statute; or
>> (B) for a tax or customs duty with respect to which the debtor —
>>> (i) made a fraudulent return; or
>>> (ii) willfully attempted in any manner to evade or to defeat such tax or such customs duty.

In the Motion to Dismiss, ETG Fire stated: "it is not clear whether the [Operative] Plan will be confirmed under Section 1191(a) or 1191(b)."  (Mot. at 7.)  However, later, ETG Fire acknowledged that it is attempting to obtain confirmation of the Operative Plan on a nonconsensual basis under Section 1191(b).  (ETG Docket No. 351 at 3 (per the "Ballot Report" submitted by ETG Fire and Midco, "Class 4 [of the Operative Plan] is not presently an accepting class."); ETG Docket No. 352 at 26 (arguing that "the [Operative] Plan complies with Section 1191(b)"); ETG Docket No. 353 at 2 ("the Debtors request that the Court confirm the Plan pursuant to 11 U.S.C. § 1191(b)").)  The Operative Plan has not been confirmed.

Based on the foregoing, for purposes of the Court's decision, the Court assumes that ETG Fire is attempting to secure confirmation of the Operative Plan on a nonconsensual basis under Section 1191(b).  ETG Fire asserts that the Section 523(a) nondischargeability provisions (such as Section 523(a)(6)) do not apply to corporate debtors (such as itself), in nonconsensual Subchapter V cases.  The Plaintiffs disagree.

The disagreement between ETG Fire and the Plaintiffs is mirrored in Subchapter V caselaw.  The disagreement arises mainly from differing interpretations of the interplay between the text of Section 1192(2) and the preamble of Section 523(a).

Section 1192(2), which specifically governs discharge in the context of nonconsensual Subchapter V reorganization, states:

> If the plan of the debtor is confirmed [non-consensually] under section 1191(b) of this title, as soon as practicable after completion by the debtor of all payments due within the first 3 years of the plan, or such longer period not to exceed 5 years as the court may fix, unless the court approves a written waiver of discharge executed by the debtor after the order for relief under this chapter, *the court shall grant the debtor a discharge of all debts provided in section 1141(d)(1)(A) of this title*, and all other debts allowed under section 503 of this title and provided for in the plan, *except any debt* —
>
> > (1) on which the last payment is due after the first 3 years of the plan, or such other time not to exceed 5 years fixed by the court; or
> >
> > (2) *of the kind specified in section 523(a) of this title*.

(emphasis added).  Notably, Section 1192(2) makes no distinction between individual and corporate debtors — it applies to both.  So, to simplify, individual and corporate

---

This exception is targeted toward debt owed to "governmental unit[s]" – not general unsecured debt.

Subchapter V debtors may discharge "all debts provided in Section 1141(d)(1)(A) "*except any debt . . . of the kind specified in section 523(a)*."

But there is a rub: the cross-reference to Section 523(a).  Section 523(a) provides:  "A discharge under section 727, 1141, 1192, 1228(a), 1228(b), or 1328(b) of this title does not discharge *an individual debtor*" from a list of 20 specified categories of debts[10] (and subparts), including, under Section 523(a)(6), for "any debt . . . for willful and malicious injury by the debtor to another entity or to the property of another entity." Recall that the Plaintiffs are seeking nondischargeability under Section 523(a)(6).

As ETG Fire correctly argues, most bankruptcy courts construing Sections 1192(2) and 523(a) have concluded — based mainly on the preamble to Section 523(a) as well as policy considerations — that the 20 categories (and subparts) of nondischargeable debt under Section 523(a) apply only to *individual* Subchapter V debtors.  Put another way, such bankruptcy courts believe creditors simply may not pursue nondischargeability under any of the Section 523(a) categories against *corporate* Subchapter V debtors.  *See*, *e.g.*, *Spring v. Davidson (In re Davidson)*, 2025 WL 511226 (Bankr. N.D. Fla. Feb. 14, 2025); *Chicago & Vicinity Laborers' Dist. Council Pension Plan v. R&W Clark Constr., Inc. (In re R&W Clark Constr., Inc.)*, 656 B.R. 628 (Bankr. N.D. Ill. 2024), *rev'd*, 2024 WL 4789403 (N.D. Ill. Nov. 14, 2024); *Nutrien Ag Sols., Inc. v. Hall (In re Hall)*, 651 B.R. 62 (M.D. Fla. 2023); *BenShot, LLC v. 2 Monkey Trading, LLC (In re 2 Monkey Trading, LLC)*, 650 B.R. 521 (M.D. Fla. 2023) (appeal pending); *Avion Funding, LLC v. GFS Indus., LLC (In re GFS Indus., LLC)*, 647 B.R. 337 (Bankr. W.D. Tex. 2022), *rev'd*, 99 F.4th 223 (5th Cir. 2024); *Jennings v. Lapeer Aviation, Inc. (In re Lapeer Aviation, Inc.)*, 2022 WL 1110072 (E.D. Mich. Apr. 13, 2022); *Catt v. Rtech Fabrications, LLC (In re Rtech Fabrications, LLC)*, 635 B.R. 559 (Bankr. D. Idaho 2021); *Cantwell-Cleary Co., Inc. v. Cleary Packaging, LLC (In re Cleary Packaging, LLC)*, 630 B.R. 466 (Bankr. D. Md. 2021), *rev'd*, 36 F.4th 509 (4th Cir. 2022); *Gaske v. Satellite Rests., Inc. (In re Satellite Rests., Inc.)*, 626 B.R. 871 (Bankr. D. Md. 2021).  The Bankruptcy Appellate Panel of the Ninth Circuit agrees: *Lafferty v. Off-Spec Sols., LLC (In re Off-Spec Sols., LLC)*, 651 B.R. 862 (9th Cir. BAP 2023).

But, save for *Off-Spec. Solutions*, 651 B.R. 862, the analysis used by most bankruptcy courts has not fared well on appeal.  The only two Circuit Courts of Appeal to have addressed the issue have decided, uniformly, as a matter of statutory interpretation, that the discharge of both *individual* and *corporate* Subchapter V debtors under Section 1192(2) is subject to the discharge limitations contained in the Section 523(a) categories.  *See Avion Funding v. GFS Indus., LLC (In re GFS Indus., LLC)*, 99 F.4th 223, 228 (5th Cir. 2024) (plain language of Section 1192(2) "subjects both corporate and individual Subchapter V debtors to the categories of debt discharge exceptions listed in Section exceptions listed in § 523(a)."); *Cantwell Cleary Co., Inc. v. Cleary Packaging, LLC (In re Cleary Packaging, LLC)*, 36 F.4th 509, 517 (4th Cir. 2022)

---

[10]     Section 523(a) current contains 20 enumerated subsections.  11 U.S.C. § 523(a)(1)-(20). However, some caselaw states that there are 21 Section 523(a) categories.  The slight discrepancy may be because some of the Section 523(a) subparts contain their own subparts.  But, the exact number of nondischargeability provisions is not particularly germane to this dispute.

("*all Subchapter V debtors* are textually subject to the discharge limitations, not just *individual* Subchapter V debtors.") (emphasis in original).  And the only District Court appellate decision on the topic concurs.  *Chicago & Vicinity Laborers' Dist. Council Pension Plan v. R&W Clark Constr., Inc. (In re R&W Clark Constr., Inc.)*, 2024 WL 4789403, at *7 (N.D. Ill. Nov. 14, 2024) ("Congress made a choice to change bankruptcy proceedings for small business debtors and chose to treat individual and corporate debtors the same.  To hold that § 523(a) only applies to individuals discharging debt under § 1192 ignores the purposeful change Congress made to the statutory language.").  Two recent bankruptcy decisions also have followed along. *Christopher Class & Aluminum, Inc. v. Premier Glass Servs., LLC (In re Premier Glass Servs., LLC)*, 661 B.R. 939, 943 (N.D. Ill. 2024) ("This court finds the circuit courts' analyses persuasive."); *Ivanov v. Van's Aircraft, Inc. (In re Van's Aircraft, Inc.)*, 2024 WL 2947601, at *6 (Bankr. D. Or. Jun. 11, 2024) (holding that "[b]ecause the meaning of Section 1192(2) is clear both in isolation and when considering the other Code sections . . . .  I am persuaded that the courts of appeals' decisions [*Cleary Packaging* and *GF Industries*] are correct"; implicitly rejecting *Off-Spec. Solutions*; and predicting that the Ninth Circuit "would likely agree with the Fourth and Fifth Circuits").

With due respect to the various Bankruptcy Courts who have ruled otherwise, this Court finds the traditional statutory analysis employed by the Fourth Circuit Court of Appeals (in *Cleary Packaging*, 36 F.4th 509) and the Fifth Circuit Court of Appeals (in *GFS Industries*, 99 F.4th 223) far more compelling and persuasive.  *See also Synergetic Oil Tools, Inc. v. Revelant Holdings, LLC (In re Revelant Holdings LLC)*, Case No. 21-CV-2213 (D. Colo. Mar. 28, 2023) (unpublished) ("The Court finds the Fourth Circuit's analysis persuasive and reverses and remands the case back to the Bankruptcy Court to reanalyze the issue in light of *In re Cleary Packaging, LLC*, 36 F.4th 509, 518 (4th Cir. 2022)).

In *Cleary Packaging,* the appellate court engaged in a thoughtful and thorough analysis of Sections 523(a), 1192(2), and 1141(d), and determined that "*all Subchapter V debtors* are textually subject to the discharge limitations, not just *individual* Subchapter V debtors."  36 F.4th at 517 (emphasis in original).  The *Cleary Packaging* panel explained its rationale:

> § 1192(2) provides for granting *debtors* a discharge of all debts, subject to stated exceptions. For the purpose of Subchapter V, the term "debtor" was defined during the relevant time period to mean "a person engaged in commercial or business activities" that has debt of not more than $7.5 million. 11 U.S.C. § 1182(1) (2020) (emphasis added).  "[P]erson" is in turn defined to include both individuals and corporations, *see id.* § 101(41), and "corporation[s]" include limited liability companies, *id.* § 101(9)(A).  We thus conclude that § 1192(2) provides for the discharge of debts for both individual and corporate debtors.

Still, even though § 1192(2) applies to both individual and corporate debtors, the question remains whether the exception to such discharges — based on § 1192(2)'s reference to § 523(a) — applies to both individuals and corporations or to only individuals.  And that question arises because the introductory language in § 523(a) limits its discharge exceptions to individual debtors.  Specifically, § 523(a) provides that § 1192, along with five other discharge sections of the Bankruptcy Code, "does not discharge an individual debtor" from a list of 21 specified debts, including "any debt ... for willful and malicious injury,"11 U.S.C. § 523(a)(6) (emphasis added), implying that corporations are not subject to the discharge exceptions.

To address the question, we begin by focusing on § 1192(2) as the provision specifically governing discharges in a Subchapter V proceeding and on the scope of its incorporation of § 523(a).  Section 1192(2) excepts from discharge "any debt . . . of the kind specified in section 523(a)."  11 U.S.C. § 1192(2) (emphasis added).  The section's use of the word "debt" is, we believe, decisive, as it does not lend itself to encompass the "kind" of debtors discussed in the language of § 523(a).  This is confirmed yet more clearly by the phrase modifying "debt"— i.e., "of the kind."  Thus, the combination of the terms "debt" and "of the kind" indicates that Congress intended to reference only the list of non-dischargeable debts found in § 523(a) . . . .  In short, while § 523(a) does provide that discharges under various sections, including § 1192 discharges, do not "discharge an individual debtor from any debt" of the kind listed, § 1192(2)'s cross-reference to § 523(a) does not refer to any kind of debtor addressed by § 523(a) but rather to a kind of debt listed in § 523(a).  By referring to the kind of debt listed in § 523(a), Congress used a shorthand to avoid listing all 21 types of debts, which would indeed have expanded the one-page section to add several additional pages to the U.S. Code.  Thus, we conclude that the debtors covered by the discharge language of § 1192(2) — i.e., both individual and corporate debtors — remain subject to the 21 kinds of debt listed in § 523(a).

We add — to the extent that one might find tension between the language of § 523(a) addressing individual debtors and the language of § 1192(2) addressing both individual and

> corporate debtors — that the more specific provision should
> govern over the more general. . . .  Thus, while § 523(a)
> references numerous discharge provisions of the Bankruptcy
> Code, § 1192(2) is the more specific, addressing only
> Subchapter V discharges.

*Id.* at 514-15 (internal citations omitted; emphasis in original).  The court went on to explain that "[t]he context of § 1192(2) within the Bankruptcy Code and the Bankruptcy Code's structure further supported" its conclusion that the debts of corporate debtors may be excepted from discharge under Section 523(a).  *Id.* at 515-17.

The Fifth Circuit Court of Appeals agreed with the *Cleary Packaging* court in *GFS Industries,* 99 F.4th 223, ruling that the plain language of Section 1192(2) "subjects both corporate and individual Subchapter V debtors to the categories of debt discharge exceptions listed in Section exceptions listed in § 523(a)."  *Id.* at 228 (citing *Cleary*, 36 F.4th at 515) and echoing that the *Cleary* court's conclusion was bolstered by reading Section 1192 within the larger context of the Bankruptcy Code.  *Id.* at 230-231.

But, ETG Fire suggests that the Fourth and Fifth Circuits are wrong and, instead, the Court should adopt the approach used by the Ninth Circuit Bankruptcy Appellate Panel: *Off-Spec Solutions*, 651 B.R. 862.  In *Off-Spec Solutions,* the appellate panel reasoned:

> Section 523(a) unambiguously applies only to individual
> debtors. The reference in § 1192 to debts "of the kind
> specified in section 523(a)" can reasonably be construed to
> mean the list of debts, but nothing in § 1192 obviates the
> express limitation in the preamble of § 523(a) or otherwise
> expands its scope to corporate debtors . . . .

> Moreover, as part of the Small Business Reorganization Act
> of 2019 ("SBRA"), Congress amended § 523(a) to add §
> 1192 to the list of discharge provisions to which it applies.
> Interpreting § 1192 to extract from § 523(a) only the list of
> nondischargeable debts, without its limitation to individuals,
> would render the amendment surplusage . . . .

> If § 1192 makes the debts specified in § 523(a)
> nondischargeable to all debtors, the concurrent amendment
> to § 523(a) has no meaning . . . .

*Off-Spec Solutions*, 651 B.R. at 867 (internal citations omitted).  The *Off-Spec Solutions* court, concluded, therefore:

> Based on the language and context of the statutes, we
> believe that the better interpretation is that § 1192 reiterates

§ 523(a)'s application to debtors under subchapter V, and
§ 523(a) limits its applicability to individuals.

*Id.*

Again, ETG Fire urges the Court to adopt the *Off-Spec Solutions* approach and thereby determine that, as a matter of law, the Plaintiffs cannot state a claim under Section 523(a)(6) to establish that any debt that might be owed by ETG Fire to the Plaintiffs is nondischargeable. As the *GFS Industries* court observed, "the issue is a close and interesting one." 99 F.4th at 226 n.1. However, while the *Off-Spec Solutions* decision is well-written and makes some important points, the Court, having reviewed the arguments of the parties and the case law, finds the analysis and determination of the *Cleary Packaging* and *GFS Industries* courts to be far more compelling and persuasive than that of the *Off-Spec Solutions* court.

In particular, the Court agrees with the *Cleary Packaging* appellate panel's conclusion that Section 1192(2), the more specific provision of the Bankruptcy Code which addresses both individual and corporate debtors, should govern over the more general preamble of Section 523(a), which does not refer to the kind of debt which is excepted from discharge. *Cleary*, 36 F.4th at 515; *GFS Indus.*, 99 F.4th at 228. As a matter of plain language statutory interpretation, the Court assesses that when Section 1192(2) refers to "any debt . . . of the kind specified in section 523(a)" that phrase is referring to the 20 categories (and subparts) of debt listed in Section 523(a) — nothing more or less.

This Court has conducted its own exhaustive and independent statutory interpretation of Sections 1192(2), 523(a), and 1141(d). However, the Court arrived at the exact same place as the Fourth and Fifth Circuits. The legal analysis set forth in *Cleary Packaging,* 36 F.4th 509, and in *GFS Industries,* 99 F.4th 223, is so clear and compelling that, as a matter of judicial humility, the Court refrains from restating the same thing again. Instead, the Court simply endorses those decisions. *See also Revelant Holdings*, Case No. 21-CV-2213 (D. Colo. Mar. 28, 2023) (Sweeney, D.J.) (unpublished) ("The Court finds the Fourth Circuit's analysis persuasive and reverses and remands the case back to the Bankruptcy Court to reanalyze the issue in light of *In re Cleary Packaging, LLC*, 36 F.4th 509, 518 (4th Cir. 2022)); Robert J. Lundy, *Applicability of Discharge Exceptions to Corporate Debtors in Subchapter V: A "Death Blow" to Rescuing Small Businesses*, 17 J. Bus. Entrepreneurship & Law 1, 29 (Fall 2023 / Spring 2024) ("The legal analysis, rooted in rudimentary statutory analysis, supports excluding the § 523(a) debts from discharge for corporate debtors in Subchapter V"; but arguing as a matter of policy that Subchapter V should be amended so that Subchapter V corporate debtors will not be subject to Section 523(a) nondischargeability actions). It is not this Court's place to second guess Congress and certainly not to construe the Bankruptcy Code so as to impose policies which this Court might prefer but which Congress did not adopt.

Accordingly, the Court rejects ETG Fire's contention that, as a matter of law, the Plaintiffs cannot state a claim for relief under Section 523(a)(6) against ETG Fire.

## C.   The Plaintiffs Adequately Alleged ETG Fire's Intent to Cause Willful and Malicious Injury.

In the Motion to Dismiss, ETG Fire argues, next, that the Plaintiffs have not stated a claim for "willful and malicious injury" under Section 523(a)(6) because the allegations stated by the Plaintiffs in the Complaint do not suffice to show willful and malicious injury *by the debtor.*  More specifically, ETG Fire argues, the Plaintiffs' allegations amount to an attempt to hold ETG Fire liable based on the improper imputation of the intent of ETG Fire's management and employees (all co-defendants in non-bankruptcy litigation pending in Oklahoma state court and Missouri federal court) to ETG Fire, and on theories of secondary liability which are inapplicable in the Section 523(a)(6) context.  The Plaintiffs disagree, contending that ETG Fire's intent can be derived from the intent of ETG Fire's agents, such that ETG's agents' intent can be imputed to ETG Fire in a nondischargeability case.

### 1.   General Inquiry Under Section 523(a)(6).

Section 523(a)(6) excepts from a debtor's discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."  As the text of the statute makes plain, nondischargeability under Section 523(a)(6) requires both a "willful injury" and a "malicious injury."  *Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004) ("Without proof of *both* [willful and malicious injury], an objection to discharge under [Section 523(a)(6)] must fail.") (emphasis in original); *Glencove Holdings, LLC v. Bloom (In re Bloom)*, 2022 WL 2679049, at *7 (10th Cir. Jul. 12, 2022) (unpublished) ("to determine nondischargeability under § 523(a)(6) we must review whether Mr. Bloom caused both a willful and malicious injury").  Stated differently, Section 523(a)(6) "requires proof of two distinct elements — the injury must be both 'willful' *and* 'malicious.'  Analyzing and applying 'willful' and 'malicious' separately is the better approach."  *First Am. Title Ins. Co. v. Smith (In re Smith)*, 618 B.R. 901, 912 (10th Cir. BAP 2020) (emphasis in original).

According to the Supreme Court, to satisfy the willful injury part of Section 523(a)(6), a plaintiff must prove "a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury."  *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998) (emphasis in original).  The focus is whether the debtor acted with the "actual intent to cause injury."  *Id.*  "Willful" injury is a higher standard than "'reckless' or 'negligent'" injury.  *Id.*  Thus, "debts arising [merely] from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)."  *Id.* at 64.   Explaining further, the Supreme Court observed that:

> [T]he (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts.  Intentional torts generally require the actor

> to intend "the *consequences* of an act," not simply "the act itself."

*Id*. at 61-62 (emphasis in original).

To establish a willful injury, a creditor may use "direct evidence that the debtor acted with the specific intent to harm a creditor or the creditor's property, or . . . indirect evidence that the debtor desired to cause the injury or believed the injury was substantially certain to occur." *Smith*, 618 B.R. at 912. *See also Moore,* 357 F.3d at 1129 ("to constitute a willful act under § 523(a)(6), the debtor must 'desire . . . [to cause] the consequences of his act or . . . believe [that] the consequences are substantially certain to result from it.'") (ellipses and brackets in original); *Cocoma v. Nigam (In re Nigam)*, 780 Fed. Appx. 559, 563 (10th Cir. 2019) (unpublished table decision) (reaffirming *Moore* formulation of willful injury); *Via Christi Reg'l Med. Ctr. v. Englehart (In re Englehart)*, 229 F.3d 1163, at *3 (10th Cir. 2020) (unpublished) ("§ 523(a)(6) turns on the state of mind of the debtor, who must have wished to cause injury or at least believed it was substantially certain to occur"). It is a subjective standard. *Smith*, 618 B.R. at 912. Per appellate precedent, "indirect evidence that the debtor desired to cause the injury or believed the injury was substantially certain to occur" satisfies the Section 523(a)(6) "willful injury" requirement. *Moore,* 357 F.3d at 1129; *Longley*, 235 B.R. at 657; *Smith*, 618 B.R. at 912; *Mitsubishi Motors Credit of Am., Inc. v Longley (In re Longley)*, 235 B.R. 651, 657 (10th Cir. BAP 1999). The Tenth Circuit has referred to such principle as "subjective substantial certainty" which "extends the scope of intent well beyond the compass of evil motive, without extending it to so far as to include consequences entirely outside the actor's ken . . . ." *Englehart*, 229 F.3d 1163, at *3 (quoting RESTATEMENT (2D) OF TORTS § 8A (ALI 1965) with approval: "A has no desire to injure C, but knows that his act is substantially certain to do so. C is injured by [A's act]. A is subject to liability to C for an intentional tort.").

The standard for "malicious" injury is different than "willful" injury. Something else is required. But what? The most recent binding appellate decision on Section 523(a)(6) puts it this way:

> [M]alicious injury requires "evidence of the debtor's motives." *In re Smith*, 618 B.R. 901, 919 (B.A.P. 10th Cir. 2020) (quotation marks omitted). To be malicious, the debtor must have "acted with a culpable state of mind vis-à-vis the actual injury caused the creditor." *Id.* (quotation marks omitted). The malicious injury requires that the action be "wrongful and without just cause or excuse." *Id.*

*Bloom*, 2022 WL 2679049, at *7. *See also Smith*, 618 B.R. at 919. The Tenth Circuit also explained:

> [P]ersonal animus is not a requirement for malicious injury. *Smith*, 618 B.R. at 919 (describing the requirements for

23

> malicious injury); *see also Ball v. A.O. Smith Corp.*, 451 F.3d
> 66, 69 (2d Cir. 2006) (explaining malicious injury means
> "wrongful and without just cause or excuse, even in the
> absence of personal hatred, spite, or ill-will (quoting *In re
> Stelluti*, 94 F.3d 84, 87 (2d Cir. 1996)).

*Bloom*, 2022 WL 2679049, at *7.  So, malice can be shown if the injury was wrongful and inflicted "without just cause or excuse."  *Wagner*, 492 B.R. at 55 (emphasis omitted); *Steward Software Co., LLC v. Kopcho (In re Kopcho)*, 2014 WL 3933657, at *6 (Bankr. D. Colo. Aug. 12, 2014) (same).  In assessing the presence or absence of "malicious injury," the totality of the circumstances must be examined.  *Dorr, Bentley & Pecha, CPA's, P.C. v. Pasek (In re Pasek)*, 983 F.2d 1524, 1527 (10th Cir. 1993) (stating that "all the surrounding circumstances, including any justification or excuse offered by the debtor, are relevant to determine whether the debtor acted with a culpable state of mind" under Section 523(a)(6)); *Smith*, 618 B.R. at 919-20 (quoting *Pasek's* "all the surrounding circumstances" language; and examining "the totality of the circumstances . . . to determine if a wrongful state of mind was present" and whether the debtor committed malicious injury).

### 2.   ETG Fire's Argument.

In the Motion to Dismiss and Reply, ETG Fire focuses on intent and asserts that the actions and intentions of third parties (*i.e.,* the management and employees of a company) cannot ever be imputed to any corporate debtor under Section 523(a)(6).  In particular, ETG Fire contends that because Section 523(a)(6) "specifically require[] acts and/or intent 'by the debtor,' dischargeability cannot be based on imputed conduct."  In support of this contention, ETG Fire points to the United States Supreme Court's decision in *Bartenwerfer v. Buckley*, 598 U.S. 69 (2023).

In *Bartenwerfer*, the Supreme Court ruled that a debt incurred on the basis of misrepresentations made by the debtor's husband, who was also her business partner, in connection with the sale of a home the debtor and her husband had remodeled as a business venture, was a "debt for money obtained by false pretenses, a false representation, or actual fraud" within the meaning of Section 523(a)(2)(A), such that the debt could be excepted from the debtor's discharge.  The Supreme Court held: "Written in the passive voice, § 523(a)(2)(A) turns on how the money was obtained, not who committed fraud to obtain it."  *Id.* at 670.  In short, the Supreme Court ruled that because the debt arose from a sale obtained through fraudulent representations, it was a "debt for money . . . obtained by . . . false pretenses, a false representation, or actual fraud," even though the debtor herself had not made the misrepresentations, the debt was excepted from discharge under Section 523(a)(2)(A).

ETG Fire argues that Section 523(a)(6), unlike Section 523(a)(2), requires conduct and intent "by the debtor" to establish nondischargeability.  ETG Fire further contends that any debt it might owe to the Plaintiffs cannot, as a matter of law, be deemed nondischargeable because the acts alleged in the Complaint are not acts of

24

ETG Fire, but rather of third parties (*i.e.*, the management and employees of ETG Fire), and that such acts may not be imputed to the Debtor.  (*See* Reply at 13, citing *In re Sharp*, 2024 WL 2819674, at *3 (Bankr. N.D. Ohio Jun 3, 2024).)

Contrary to ETG Fire's position, the Fourth and Fifth Circuits, this court, and several other courts, have determined that the debts of corporate debtors in Subchapter V cases may be excepted from discharge pursuant to Section 523(a)(6) and therefore have implicitly assumed that a corporate debtor may have the requisite intent to establish nondischargebility of its debts.  *See Cleary*, 36 F.4th at 509 (finding that debts of Subchapter V corporate debtors may be determined to be nondischargeable under Section 523(a)(6) and remanding case for further proceedings); *GFS Indus.*, 99 F.4th at 223 (agreeing with *Cleary* and remanding for further proceedings); *Premier Glass*, 661 B.R. 939 (concluding that the language of section 1192(2) is clear and that plaintiff seeking to except a corporate debtor's debt from discharge under Section 523(a)(6) had stated a claim such that a motion to dismiss should be denied pursuant to Rule 12(b))*; Van's Aircraft*, 2024 WL 2947601, at *6 (declining to dismiss Section 523(a)(6) claim against corporate Subchapter V debtor).  However, no courts seem to have answered the question of *how* a corporate debtor's intent may be established under Section 523(a).

### 3.      Actions and Intentions "of the Debtor".

ETG Fire construes the case law holding that the conduct of others cannot be imputed to a debtor for purposes of Section 523(a)(6) far too broadly.  While the Court agrees that the acts of one natural person may not be imputed to another natural person for purposes of Section 523(a)(6) (a point on which ETG Fire and the Plaintiffs agree),[11] ETG Fire's contention that a *corporate debtor's* acts and intent cannot be determined by reference to the acts of its management and employees is simply not supported by case law.  And, taken to its logical extreme, what ETG Fire is really suggesting is the wrongheaded proposition that corporations cannot have intent at all.

Because they are not natural persons, corporate entities, such as ETG Fire, "act only through 'the instrumentality of their officers or other duly authorized agents.'"  *Secs. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Secs., LLC*, 650 B.R. 24, 35 (Bankr. S.D.N.Y. 2023) (quoting *John Lofts, LLC v. Meridian Cap. Grp., LLC (In re 45 John Lofts, LLC)*, 599 B.R. 730, 743 (Bankr. S.D.N.Y. 2019)).  As such, an agent's knowledge and acts may properly be imputed to a corporate defendant.  *Id.* at 35-36 (citing *John Lofts*, 599 B.R. at 743).  *See also Knox v. 1st Sec. Bank of Utah*, 206 F.2d 823, 826 (10th Cir.

---

[11]      ETG Fire points to *Sharp*, 2024 WL 2819674, and myriad other cases, to support the proposition that the conduct of others cannot be imputed to a debtor for purposes of § 523(a)(6).  *Sharp* does support this contention, but only with respect to imputing the intention of one natural debtor to another natural person.  And ETG Fire is correct in concluding that the *Sharp* court construes *Bartenwerfer* to mean that a faultless individual cannot be held liable for another's debt absent a special relationship.  However, the debtor in *Sharp* was a natural person (not a corporate entity), so the issue of whether and how a corporate entity's conduct and intentions are to be determined was not at issue in *Sharp*.  In fact, none of the case law that ETG Fire cited addresses the corporate issue.  This issue also generally does not arise in a standard Chapter 11 reorganization.

1953) ("It is, of course, true that a corporation can act only through its officers and agents and that knowledge of the officers is generally imputed to the corporation."); *In re Stat-Tech Secs. Litig.*, 905 F. Supp. 1416, 1422 (D. Colo. 1995) ("Generally, the acts and knowledge of an agent are imputed to the principal.  Because a corporation can act only through its agents, the rule is that the actions of corporate officers and directors are attributable to the corporate entity."); *Am. Int'l Grp., Inc. v. Greenburg (In re Am. Int'l Grp. Inc., Consol. Derivative Litig.)*, 976 A.2d 872. 889-90 (Del. Ch. 2009) (noting that "a corporation must act through its human agents" and stating that "the agents' actions are the actions of the corporation itself"); *Satellite Fin. Planning Grp. v. 1st Nat'l Bank of Wilmington*, 633 F. Supp. 386, 400 (D. Del. 1986) ("Knowledge and action of a corporation's agent ordinarily are imputed to the corporation when the agent acts on the corporation's behalf."); *Lumbermens Mut. Cas. Co. v. Thornton*, 92 S.W. 3d. 259, 270 (Mo. Ct. App. 2002) ("normally, the acts of a corporation's agent are imputable to its principal") (citing *Miller v. Ernst & Young*, 938 S.W.2d 313, 315 (Mo. Ct. App. 1997)); *Webb Agency, Inc. v. Com. Std. Ins. Co.*, 333 F. Supp. 966, 968 (E.D. Mo. 1971) ("agent's malice is imputable to the corporation, making the latter liable for malicious, willful, or criminal torts of its agents or employees within the scope of their employment") (citing *State on Inf. of Taylor v. Am. Ins. Co.*, 200 S.W.2d 1 (Mo. 1946); *State ex rel. United Factories, Inc., v. Hostetter*, 126 S.W.2d 1173 (Mo. 1939); *Simmons v. Kroger Grocery & Baking Co.*, 104 S.W.2d 357 (Mo. 1937); 19 Am.Jur.2d Corporations § 1428; 19 C.J.S. Corporations § 1263, and other authority).  *Cf. Meitav Dash Provident Funds & Pension Ltd. v. Spirit AeroSystems Holdings, Inc.,* 79 F.4th 1209, 1217 (10th Cir. 2023) (determining, in securities fraud action, that scienter can be imputed to a corporation where an official intentionally or recklessly approves a false statement to the public).

The same reasoning applies in the bankruptcy context.  For example, in *Drivetrain, LLC v. DDE Partners, LLC (In re Cyber Litigation, Inc.)*, 2023 WL 6938144 (Bankr. D. Del. Oct. 19, 2023), the court put it this way:

> It is generally accepted that, in connection with a fraudulent conveyance claim, "[t]he only relevant intent is that of the debtor."  Where the debtor is an individual, this analysis is straightforward; the individual's intent controls.  Where the debtor is a corporation or other legal entity, however, the enquiry becomes more nuanced.  Entities cannot themselves actually form an intent.  Rather, as an extension of the general principle that entities can only act through their officers, directors, or agents, an entity's intent is determined by imputing the intent of its agents.
>
> . . . .
>
> [T]he Third Circuit explained, ". . . a corporation can speak and act only through its agents and so must be accountable for any acts committed by one of its agents within his actual

or apparent scope of authority and while transacting corporate business." Thus, in the fraudulent conveyance context, so long as a corporation's agent had the requisite fraudulent intent when it caused the corporation to carry out the transaction, that intent is imputed to the corporation.

*Id*. at *7-8.

Based on such principles, the Court concludes that, for purposes of Section 523(a)(6), a corporate entity's intent may be determined by imputing to the entity the acts and intentions of the corporate entity's management and senior employees, acting within the scope of such agents' employment, in the entity's interest. If it were otherwise, no corporation could ever be convicted of a crime requiring intent or held liable for tortious misconduct requiring intent. That cannot be. *See Bolsa Res., Inc. v. Martin Res., Inc.*, 2014 WL 4882132, at *9 (D. Colo. Aug. 28, 2014) (on default judgment, factual allegations were sufficient to establish that corporate defendant (Salzburg Holdings, LLC) had engaged in tortious interference with business relations, a claim requiring intent); *People v. Am. Health Care, Inc.*, 591 P.2d 1343 (Colo. App. 1979) (affirming conviction of corporate entity for theft, a crime requiring intent).

In this case, the Plaintiffs made numerous factual allegations (which must be accepted as true) showing that Vanderstokker and Czarnowski, both executives and officers of ETG Fire acting in the scope of their employment, engaged in numerous shenanigans. For example, they allegedly knowingly encouraged, aided, abetted, and participated in a scheme to divert the Plaintiffs' customers to ETG Fire and to use the Plaintiffs' propriety and confidential information and trade secrets for the benefit of ETG Fire to the detriment of the Plaintiffs' business. The Plaintiffs' factual allegations that officers and executives of ETG Fire (as well as numerous senior employees of ETG Fire) acted with such intention suffice to state a basis for finding that ETG Fire, through its agents, had knowledge of the Plaintiffs' rights and engaged in conduct violative of such rights since they knew that such actions would cause particularized "willful and malicious injury" to the Plaintiffs. Under the circumstances, the Court finds that the Plaintiffs have stated a claim for relief under Section 523(a)(6).

**D.    The Complaint Need not Be Dismissed in Favor of the Claims Allowance Process.**

In the Motion to Dismiss, ETG Fire asserts that the Complaint should be dismissed because ETG Fire has objected to the Plaintiffs' claims in the ETG Fire Case and initiated the claims allowance and disallowance process pursuant to Fed. R. Bankr. P. 3003.

Under Fed. R. 7001(f),[12] "a proceeding to determine whether a debt is dischargeable" is an adversary proceeding governed by the rules in Part VII of the

---

[12]    Formerly, Fed. R. Bankr. P. 7001(6).

Federal Rules of Bankruptcy Procedure, rather than Rule 3003.  As explained previously, Section 523(a) nondischargeability claims all require a two-part analysis.  First, "the bankruptcy court must determine the validity of the debt under applicable law."  *Thompson*, 555 B.R. at 8.  *See also Lang*, 293 B.R. at 513.  This is referred to as the "claim on the debt" component.  *Thompson*, 555 B.R. at 8.  The claim on the debt component is decided based upon applicable non-bankruptcy law.  *See Grogan*, 498 U.S. at 283.  Second, if there is a valid debt, "the bankruptcy court must determine the dischargeability of that debt under Section 523."  *Lang*, 293 B.R. at 513.  This is referred to as the "dischargeability" component.  *Thompson*, 555 B.R. at 8.

So, determining the amount of a debt (the "claim on the debt" component) is central (even required) in a Section 523(a) nondischargeability action.  That the debt may be in dispute (and subject to a claims objection) is certainly not a basis for dismissing a nondischargeability adversary proceeding.

Notwithstanding, judicial efficiency suggests that since ETG Fire contests the validity and amount of the Plaintiffs' claims in this Adversary Proceeding as well as in the claims allowance and disallowance process (through the POC Objection), such issues might best be joined together for trial.  As the Plaintiffs note, Fed. R. Civ. P. 42(a) (made applicable to these proceedings by Fed. R. Bankr. P. 7042 and 9014(c)) may also allow for the consolidation of actions that involve common questions of law or fact such that the matters may be joined for hearing or trial.  In any event, ETG Fire's argument does not warrant dismissal of the Complaint.

### VIII.   Conclusion and Order.

For the foregoing reasons, the Motion to Dismiss is DENIED pursuant to Fed. R. Civ. P. 12(b)(6), as incorporated by Fed. R. Bankr. P. 7012(b).  ETG Fire shall file a pleading responsive to the Complaint within 14 days, consistent with Fed. Bankr. P. 7012(a)(6)(A).

Dated this 20th day of March, 2025.

BY THE COURT:

*Thomas B. McNamara*
Thomas B. McNamara,
United States Bankruptcy Judge

28